**Thomas L. LAY and Benjamin Brown, Appellants,**

v.

**UNITED STATES, Appellee.**

**No. 99–CF–947, 99–CF–1675.**

District of Columbia Court of Appeals.

Argued Feb. 13, 2003.
Decided Sept. 18, 2003.

Thomas T. Heslep, Alexandria, VA, appointed by the court, for appellant Lay.

Thoms P. Lydon, appointed by the court, for appellant Brown.

David B. Goodhand, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Roy W. McLeese III, and Karen L. Melnik, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, SCHWELB, Associate Judge, and KING, Senior Judge.

KING, Senior Judge:

This matter is before the court on the appeal of Brown and Lay after conviction of distribution of controlled substance, heroin, in violation of D.C.Code § 33–541(a)(1) (1981).[1] While Brown raises a number of issues, Lay only claims that the evidence was insufficient to support his conviction. With one exception, all of the issues presented can be resolved summarily as set forth in Part III, *infra.* Only Brown's challenge to the trial court's denial of his request to be present at the bench during the *voir dire* of the potential jurors re-

---

1. Now codified at § 48–904.01 (2001).

quires a more extensive discussion. Finding all of Brown's and Lay's contentions unpersuasive, we affirm.

## I.

▬▬▬ The only issue requiring this opinion is Brown's appeal of the trial court's denial of his request to be present during individual *voir dire* of prospective jurors, which was made well after the process began. The parties appeared before the trial court on April 27, 1999, for a jury trial and the trial judge began by explaining the *voir dire* process that was to be conducted the following day once the jury panel was seated in the courtroom in the order in which they appeared on the jury list. The judge informed the defendants and the attorneys that he would explain to the jury panel that he would be asking them a series of questions, with each question numbered, and the jurors were to write on a card that had been provided to them the number of any questions they answered affirmatively. While most of the questions would be uncontroversial, the "*Ridley*" question inquiring whether the potential jurors or persons close to them have been accused of, the victim of, or a witness to a crime was one of the questions that would be asked. *See United States v. Ridley*, 134 U.S.App. D.C. 79, 81, 412 F.2d 1126, 1128 (1969) (per curiam). At the conclusion of the reading of the questions by the trial judge, each juror would be brought to the bench to elaborate on their affirmative responses to the questions asked by the trial judge. Those responses would be made in the presence of the judge and the attorneys.[2]

On April 28, 1999, once the sixty prospective jurors had been seated in the courtroom in the order in which they appeared on the jury list, the judge repeated his explanation of the process. He emphasized that "at the end of asking all of the questions, we will bring each juror up ... [a]nd then we will have a discussion here at the bench regarding your answer." The judge then posed twenty-one questions to the jury.[3]

After asking all the questions, the judge explained for the third time how the responses by individual jurors would be received. The judge stated: "When you come up, ... the lawyers will be grouped around in like a little huddle together, all

---

**2.** Following the *Ridley* decision, *Ridley, supra,* 134 U.S.App. D.C. at 79, 412 F.2d at 1126, trial judges began questioning individual prospective jurors at the bench concerning their answers to the so-called *Ridley* question, as well as their answers to other questions that might prove prejudicial to the government or the defense. *Robinson v. United States,* 456 A.2d 848, 850 (D.C.1983) (Belson, J., statement) (holding that a defendant has a right to be present for individual *voir dire* of prospective jurors); *Boone v. United States,* 483 A.2d 1135, 1141 (D.C.1984) (en banc) (same). Also responses to questions that might be embarrassing to the individual juror were taken at the bench. Responses to other questions asked, however, were ordinarily given in open court.

Thus when *Robinson* was decided, only some of the prospective jurors' responses were heard at the bench. The inquiries at the bench occurred outside "of the defendant's immediate presence and hearing," *Brodis v. United States,* 468 A.2d 1335, 1336 (D.C. 1983), "while the defendant... remain[ed] at counsel table." *Robinson,* 456 A.2d at 850. "[D]efense counsel is usually permitted to go over to counsel table and speak to defendant as often as desired during the bench conference." *Id.* In *Robinson,* however, we held that a defendant has the right to hear directly the question posed and the answers given. In order to invoke this right, a defendant must request to be present. Moreover, that right is not unlimited, particularly when the safety of the jurors or the efficient administration of justice could be compromised. *Briggs v. United States,* 525 A.2d 583, 589 (D.C.1987).

**3.** The twenty-one questions asked are set forth in the appendix attached to this opinion.

of us together.... [A]fter I've asked you some questions, I will permit the lawyers to ask some follow-up questions.... After we've done that, then you'll be asked to return back to your seat." When the judge called counsel to the bench neither requested that his or her client be present for the questioning of the jurors. The judge then began calling the jurors, one-by-one, to the bench to discuss the affirmative answers to the questions indicated on their cards. Seventeen jurors were questioned at the bench before the break for lunch.

Following the one hour lunch break, the trial judge resumed the questioning of the jurors. After two more jurors were questioned, Brown's counsel stated that her client wanted to exercise his right to participate in the *voir dire* bench conferences. Brown's counsel stated:

> Just for the record. My client wanted me to tell the Court that he would like to be part of this and hear the responses.
>
> I know this is probably problematic. I just wanted to get it on the record.
>
> I don't foresee another way other than the jury room. I don't want him up

here with marshals[4] behind him because I think that screams incarceration.

But I think I need to make my record on behalf of Mr. Brown.

Responding to the request, the court replied, "If we had considered that at the beginning, I would have taken [Lay's attorney's] suggestion that maybe we should do it in the jury room where they can be present and not [have] a problem." When Brown's counsel stated that she did not hear Lay's attorney make that suggestion, Lay's attorney responded, "It was just sort of a casual thing at the end of the morning session when my feet were getting tired." Lay's attorney made no further representation regarding the request by Brown's counsel that Brown be present. Nor did Lay's counsel request that Lay be present.

The trial judge then stated that he was unwilling to change the *voir dire* process in the middle of the examinations. The trial judge stated, "If you feel the need to consult with him during the *voir dire*, I'll give you leave to go talk to him about that." Brown's counsel replied, "Very well. I appreciate it." The *voir dire* bench conferences then continued outside of Brown's presence. Nine[5] of the twelve

---

4. Both defendants were being held in custody and in those circumstances, the ordinary practice is to assign a deputy marshal to each defendant being held. The record does not reflect whether there was one deputy marshal or two, but we assume that the usual procedure was followed and that there was one deputy marshal for each defendant. Ordinarily, the deputy marshal stands near the defendant to whom he or she is assigned. Therefore, if a defendant wishes to be present at the bench conference, the deputy marshal assigned would be standing nearby. If both defendants requested to be at the bench, then both marshals would also be present. Thus with two defendants, there would be a total of eight people present (two defendants, two deputy marshals, two defense lawyers, a prosecutor, and the court reporter) in addition to the prospective juror. Because in those cir-

cumstances the area in front of the bench would be quite crowded, some trial judges conduct the *voir dire* in the jury room next to the courtroom. There, the judge, the court reporter, the lawyers and the defendants would be seated at the table with the deputy marshals standing nearby. Then the prospective jurors would be called in to the jury room one at a time for questioning.

5. The number of jurors—nine—was determined from the transcript of the jury selection process, which establishes which jurors were questioned before and after Brown's request to be present at the bench was denied, and the Jury List and Report, which indicates the jurors who were struck from the jury and the jurors who were chosen to sit on the jury. Eleven jurors who were questioned after Brown's request became members of the jury.

jurors who deliberated were questioned after counsel's request was denied.

Most of the questions the judge and defense attorneys discussed with the nine jurors were uncontroversial. Of the nine jurors: two (Nos. 984 and 315) knew other people on the panel who ultimately did not sit on the jury; three (Nos. 926, 948 and 136) explained their medication and health problems; five (Nos. 918, 948, 951, 136, and 315) knew or were related to people involved in law enforcement or the judicial system; and finally, two (Nos. 247 and 281) of the nine jurors who deliberated answered none of the questions affirmatively. None of the jurors who deliberated answered affirmatively to either question number 17 inquiring whether they could "sit fairly and impartially" or question number 19, relating to their attitude toward drugs.

Three (Nos. 951, 136, and 315) of the nine jurors responded affirmatively to the *Ridley* question. One of those jurors, No. 951, reported that a friend had been beaten and robbed the previous week, but regardless of the incident he could be a fair juror. In response to a questioned posed by Brown's attorney, the juror answered that the police treated his friend well.

Another juror, No. 136, stated that although his brother had gone before a judge for possession of marijuana, he could be a fair juror. When questioned by the prosecutor, he responded that his brother was treated fairly. Brown's counsel, as well as Lay's attorney, had no questions for this juror.

The third juror, No. 315, explained that she had witnessed a crime stating: "Cars parked in my alley was smoking. And apparently it was supposed to be hi-

ghjacked but it wasn't. So the detectives said that the man was going to highjack— it was a drug killing and had someone stolen car and got rid of his own car." Neither the judge nor the attorneys questioned the juror further about the incident.

Five (Nos. 918, 948, 951, 136, and 315) of the nine jurors knew or were related to people involved in law enforcement or the judicial system. The first juror, No. 918, informed the court that her ex-husband had retired from the District of Columbia Metropolitan Police Department about six to eight months earlier. In response to the judge's statement, "In terms of believing a police officer just because he's a police officer doesn't mean that he's telling the truth nor does it mean he's lying. You would listen to each person's testimony whether it's a police officer or not and judge it based upon what you hear; is that correct?" The juror replied affirmatively and explained that the fact she was married to a police officer did not change that. None of the attorneys questioned the juror further.

The second juror, No. 948, explained that he knew people who were lawyers and that he did not converse with them about criminal law. None of the attorneys had questions for this juror.

Another juror, No. 951, indicated that he had one cousin who studied law and other cousins who were police officers. When asked by the prosecutor whether he would "believe police officers who testified more so than any other witness," the juror stated, "No, I think ... that the victim or the defendant has just as much right to testify as the police officer." In response to a question posed by Brown's counsel con-

---

One of those jurors, Juror 11 (see the fourth issue raised by Brown, *infra* Part III at 15–16), was excused during trial. That juror was replaced by an alternate juror who had been questioned before Brown's request. Another juror (No. 477) of the eleven questioned was the second alternate who did not participate in deliberations.

cerning his cousin's practice of law, the juror began to explain, "I think it's criminal law. It's—first of all, children—I think it's a" when counsel interrupted him stating that she had no further questions. Lay's attorney did not pose any questions to this juror.

The fourth juror, No. 136, advised the court that he could be a fair juror even though his sister and three friends were attorneys and his cousin was a police officer. In response to the prosecutor's questions, the juror responded that although he did not know his sister's exact position, she was an attorney for "D.C. Justice," and that his cousin worked on the police force in Westchester County, New York. Neither defense attorney asked the juror any questions.

The final juror, No. 315, informed the court that her son, daughter and cousins all worked for the Metropolitan Police. Her son worked as a policeman and her daughter as a guard. In response to the prosecutor's question, the juror explained that her son worked as a rifle range instructor at the academy. The juror indicated to the prosecutor that she would not believe a police officer's testimony over someone else just because they were an officer. Brown's counsel asked the juror which districts of the Metropolitan Police Department her relatives worked in, and whether they were involved in vice or narcotics. At counsel's request, the juror reemphasized that she would evaluate police officer "testimony on the same level as anybody else's testimony" and would do so without hesitation if the judge instructed her so. Lay's attorney posed no questions to this juror.

None of the remaining questions were answered affirmatively by any of the jurors who participated in deliberations. The *voir dire* process began at approximately 11 that morning and was not completed until the end of the day.

## II.

■ Defendants have a right to be present at *voir dire* bench conferences when prospective jurors are being questioned. *Boone, supra* note 2, 483 A.2d 1135. We have held, however, that a defendant's "failure either to request that he be present during the portions of the proceedings which took place in his absence or to object to his exclusion therefrom constitutes a waiver of that right and forecloses the opportunity to be heard on appeal." *Welch v. United States,* 466 A.2d 829, 839 (D.C.1983). Moreover, a defendant's right to be present is not unlimited, and any request to be present must be timely made. *Briggs, supra* note 2, 525 A.2d at 589–90. Where a defendant does not make a timely request "the trial court must weigh ... the *efficient administration of justice* against 'the principle that the presence of the defendant is essential to the legitimacy of our criminal justice system.'" *Id.* at 589 (citation omitted) (emphasis added). The right to be present can be satisfied by "alternate procedures where, for example, there are multiple defendants or where security is a problem." *Boone, supra* note 2, 483 A.2d at 1142.

In *Briggs,* several psychiatrists had found that the defendant was mentally unstable and incompetent, and there was a risk that he would not behave at trial, and thus might intimidate jurors, threaten their safety, or cause them to be prejudiced against him. *Briggs, supra* note 2, 525 A.2d at 590. The trial court therefore denied appellant's request, which came after two jurors had been questioned outside his presence, to participate in the bench *voir dire. Id.* On appeal, we held:

To accommodate appellant's late request the trial court would have had to inter-

rupt the proceedings, perhaps for a considerable time, to make special arrangements to satisfy both appellant's rights and the need for juror protection. Such arrangements could not be designed and instituted immediately, given the physical limitations of court room facilities. Even the alternative of conducting *voir dire* in open court, with appellant remaining at counsel table, posed logistical problems, since the trial court could not simply clear the courtroom of other members of the jury panel without having made arrangements for their convenient location and orderly recall. In short, "it does not seem ... to be consonant with the dictates of common sense that an accused person ... should be at liberty whenever he [or she] pleased, ... to break up a trial already commenced."

*Id.* (citation omitted). We continued:

Appellant's counsel was on notice from the prolonged competency proceedings, if nothing else, that appellant's mental instability would present problems in accommodating his request to be present at bench *voir dire. Counsel should have known that special arrangements would have to be made;* he therefore *had a duty to notify* the court, before the jury panel was called in, that *appellant would, or at least might, assert this right.* In view of the interruptive and special precautions that would have been required, we perceive no error in the trial court's denial of appellant's untimely request to be present at *voir dire* bench conferences.

*Id.* (emphasis added).

In this case, Brown's counsel waited until after the afternoon session was under way to inform the court of her client's request to invoke his right to participate, and to suggest that the conferences take place in the jury room rather than at the

bench in order to minimize any juror prejudice that could result from the deputy marshal hovering behind Brown at the bench. At the time of the late request, the court had already questioned nineteen jurors—including the two who were questioned after lunch—outside Brown's presence. We conclude that the trial court, under the circumstances, could properly reject the request to be present, because it was not timely made.

In order to accommodate counsel's requests, the trial court would have had to interrupt the afternoon proceedings and have all of the jurors leave the courtroom so that both Brown and Lay and the deputy marshals assigned to them could move to the jury room unseen by the prospective jurors. The jurors would then be returned to the courtroom and called one-by-one to the jury room. The arrangements for the relocation of the jury and their orderly recall could not have been arranged or executed immediately, and would have been time-consuming, disruptive and cumbersome on a day when the *voir dire* process was already taking more time than normal. *See id.* Finally, once all the jurors had been questioned, and challenges for cause resolved, all prospective jurors would have to be removed from the courtroom again so that the defendants and the deputy marshals could resume their places in the courtroom unseen by the jurors. The jurors then would be reseated in the courtroom in numerical order. All told, given the fact that the process as conducted consumed the entire day, it is likely that with the disruptions necessitated by the late request to be present, jury selection would not have been completed until the next day.

In addition, the *voir dire* process was verbally explained by the judge three separate times in counsel's presence before the *voir dire* bench conferences com-

menced. Brown's counsel, knowing that Brown might assert his right to be present, was fully aware that the deputy marshal's position behind Brown at the bench might be prejudicial to Brown. *See id.* She, therefore, had a duty to notify the court before the *voir dire* process began that alternative arrangements would be requested if Brown asserted his right to be present. *See id.*

■ Moreover, the record does not reflect any departure from the bench conference, during which counsel might have had a conversation with her client, after the afternoon session began. Therefore, it appears likely that Brown had informed counsel before the commencement of the afternoon session that he wanted to invoke his right. Counsel thus had a duty to notify the court before the jury was seated in the courtroom, as well as before the two jurors were questioned, of Brown's request to be present and her suggestion for special accommodations. *See id.* We think that under the circumstances, after being informed on three occasions the procedure that would be followed, and in light of counsel's failure to notify the court of her client's wishes before the afternoon session began, that the defendant waived his right to be present during the questioning of jurors.

There is no established rule fixing the point in the proceedings by which the defense must request the defendant's presence; however, the request must be made sufficiently in advance for the trial court to respond to it in an efficient manner. Brown's counsel had an opportunity prior to the commencement of jury selection in the morning, as well as before the jurors were reseated in the courtroom for the afternoon session, to request that the *voir dire* conferences be held in the jury room.

Had counsel notified the trial judge at an earlier time of her request for special accommodations, the judge could have changed the location of the conferences with minimal disruption or delay because he would not have had to relocate the jurors while the defendants and marshals moved to the jury room. Because of the amount of disruption that would have occurred in this case, we conclude that the trial court did not err in denying Brown's untimely request to be present at the bench *voir dire.*

Finally, we doubt that, under the circumstances, Brown's presence would have changed the outcome.[6] *See Gary v. United States,* 499 A.2d 815, 835 (D.C.1985); *Young v. United States,* 478 A.2d 287, 291 (D.C.1984). Some of the jurors did affirmatively answer the *Ridley* question and the question related to law enforcement, but in no case were the responses given aggravated in nature or likely to require in-put from Brown. Moreover, we think it significant that none of the jurors responded affirmatively to questions related to their ability to be fair and their attitude toward drugs—perhaps the two most important questions for determining bias.

■ In addition, because Brown was present in the courtroom during the entire *voir dire* process, he had sufficient opportunity to discuss with counsel the jurors' responses and any issues that the questioning revealed. *See United States v. Washington,* 227 U.S.App. D.C. 184, 191, 705 F.2d 489, 498 (1983) (per curiam); *United States v. Feliciano,* 223 F.3d 102, 112 (2d Cir.2000). Most of the jurors' answers discussed at the bench were in response to uncontroversial and insignificant questions, *i.e.* the health and medication of the jurors, and the recognition of other people on the panel. Two panel

6. Brown used all of his peremptory challenges.

members answered none of the questions affirmatively. *Murray v. United States,* 532 A.2d 120, 123 (D.C.1987) (holding that follow up questions regarding juror's friends and family involved in law enforcement or judicial system are "common areas of inquiry in a jury *voir dire* " and "do not fall ...within the categories of 'controversial matters requiring careful inquiry.' "). *See also Davis v. State of Mississippi,* 767 So.2d 986, 992 (Miss.2000) ("[W]e adopt a bright line rule that the trial judge's general questioning of prospective jurors, to ascertain those who are qualified for, or exempt from, jury service is not a critical stage of the criminal proceedings during which a criminal defendant is guaranteed a right to be present. Such statutory matters as whether a prospective juror is a resident of the county, is ill or has an illness in the family, or is over 65 years of age are not matters which necessitate a defendant's presence. A defendant ... has no guaranteed right to be present."); *People v. Antommarchi,* 80 N.Y.2d 247, 590 N.Y.S.2d 33, 604 N.E.2d 95, 97 (1992) ("A court may conduct sidebar discussions with prospective jurors in a defendant's absence if the questions relate to juror qualifications such as physical impairments, family obligations and work commitments.").

In sum, we conclude that by not making a timely request to be present for the individual questioning of jurors, Brown waived his right to be present. In any event, for the reasons stated, Brown's presence would not have changed the outcome.

### III.

Brown's remaining claims and Lay's sole contention are all without merit as discussed below.

■ Brown claims error in the trial judge's denial of his motion ' to suppress identifications as well as the physical evidence that flowed from those identifications. Giving deference to the trial judge's finding that the identifications were reliable, we conclude that the judge did not err in denying Brown's motion. *See In re L.G.T.,* 735 A.2d 957, 959 (D.C.1999).

■ Brown also contends that the trial judge abused his discretion in denying his motion to sever his trial from that of codefendant Lay. *Bright v. United States,* 698 A.2d 450, 454 (D.C.1997). Brown failed to "demonstrate a 'clear and substantial contradiction between the respective defenses,' causing inherent irreconcilability between them." *Garris v. United States,* 559 A.2d 323, 329 (D.C.1989) (citation omitted). Even if Brown had made the requisite showing, he still failed to establish that "the conflict *alone* created a danger that in a joint trial the jury would unjustifiably infer his guilt." *Clark v. United States,* 367 A.2d 158, 160 (D.C. 1976) (emphasis in original). Finally, the record contains sufficient independent evidence of Brown's guilt. *See Sams v. United States,* 721 A.2d 945, 954 (D.C.1998), *cert. denied,* 528 U.S. 1135, 120 S.Ct. 977, 145 L.Ed.2d 928 (2000) (stating that where sufficient independent evidence of appellant's guilt exists, severance need not be granted). The trial judge did not abuse his discretion in denying severance.

■ Brown argues that the prosecution violated his rights by allegedly failing to book him for distributing a controlled substance—the crime he was convicted of even though he was indicted for that offense before the trial. We are unaware of any authority establishing a "right to be booked" and Brown cites us to none. In any event, because Brown failed to raise this issue in the trial court, he waived any claim of error related to the failure to formally book him. *See*

*Smith v. United States,* 295 A.2d 64, 68 (D.C.1972) (stating "absent some showing of plain error, courts in this jurisdiction have refused to notice claims of error raised for the first time on appeal"); *Young v. United States,* 639 A.2d 92, 96 n. 8 (D.C.1994). Furthermore, Brown suffered no harm because he had adequate notice of the charge against him due to the indictment, which fully informed Brown of the offense charged.

 Brown asserts that the trial judge abused his discretion when he dismissed a juror without giving his counsel a chance to determine whether the dismissal was justified. Pursuant to D.C.Super. Ct.Crim. R. 24(c) (2001), an "alternate juror ... shall replace a juror who, becomes or is found to be unable or disqualified to perform jury duties." The Rule is "designed for the situation" where "during the course of a trial it becomes necessary to excuse a juror for illness or like cause." *Graham v. United States,* 267 A.2d 358, 360 (D.C.1970). In this case, the trial judge did not abuse his discretion by dismissing Juror No. 11 after determining that Juror No. 11 was in a "distracted, emotional state" due to the sudden onset of her husband's illness. In addition, the judge noted that Juror No. 11 would need to be available to consult with doctors about her husband's course of treatment.

 Brown argues that the trial judge denied him his rights to effective assistance of counsel and to full discovery because police reports were not given to him until the final day of trial. Because Brown failed to file a post-trial § 23–110 motion in the trial court, this court is left with only the trial record on which to decide Brown's claim. *Simpson v. United States,* 576 A.2d 1336, 1338 (D.C.1990) ("The government has the right to contribute to the creation of [a record as to effectiveness of trial counsel], and a defendant may not

unilaterally decide that the issue shall be determined solely on the basis of the trial record, eschew the filing of a § 23–110 motion, and thus foreclose the prosecution's opportunity to adduce evidence relevant to ineffective assistance and prejudice.... We reiterate that in the overwhelming majority of cases it is inappropriate to raise the issue of ineffective assistance of counsel on direct appeal. Attempts to do so are rarely if ever successful.") Regardless, we discern no merit to Brown's claim, for the record reflects that upon being given the government documents and an opportunity to re-open her cross-examinations of the police officers, Brown's counsel stated that she did not want to ask any questions of the witnesses based upon the documents. Thus, because Brown was given the opportunity to reopen cross-examination, there was no denial of his right to effective assistance of counsel or full discovery. *See United States v. Wables,* 731 F.2d 440, 447 (7th Cir.1984) (holding that opportunity to reopen cross-examination adequately remedied any possible prejudice caused by belated production of *Jencks* material).

 Brown also contends that his counsel was ineffective because she failed to request a continuance so that transcripts of the suppression hearing could be prepared and later used to impeach Metropolitan Police Department Investigator William Xanten's testimony. For an ineffective assistance of counsel claim to succeed, Brown must demonstrate that counsel's performance at trial was deficient and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 691–92, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). On appeal Brown merely surmises that he was "convicted, in large part on the testimony of

[Investigator] Xanten," and he would not have been found guilty had Investigator Xanten been impeached with his prior inconsistent testimony; thus, in the absence of any showing of prejudice, we find that Brown failed to establish that his counsel was ineffective.

Finally, Brown's claim that the trial judge erred by excluding references to cocaine, which residue was discovered in a ziplock bag, but allowing references to heroin into evidence presented at trial fails because he raises it for the first time on appeal. *See Smith, supra,* 295 A.2d at 68; *Young, supra,* 639 A.2d at 96 n. 8.

■ Lay claims that the evidence was insufficient to support his conviction. In reviewing a claim of evidence insufficiency, this court "views the evidence 'in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact.'" *Gibson v. United States,* 792 A.2d 1059, 1065 (D.C.) (citation omitted), *cert. denied,* 536 U.S. 972, 122 S.Ct. 2692, 153 L.Ed.2d 861 (2002). Lay's motion for judgment of acquittal should only be granted if there is "no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt .…" *Id.* On this record, we conclude that there is sufficient evidence from which a reasonable juror could find Lay guilty beyond a reasonable doubt of distribution of a controlled substance.

*Affirmed.*

### Appendix

Question No. 1—"[B]ased upon the little information I have given you, … is there anyone present who believes that they know anything about this offense?"

Question No. 2—"Does anyone live or work near that area or have some special familiarity with the immediate area where the offense occurred?"

Question No. 3—"Does anyone recognize Ms. Melnik? … Does anyone recognize Ms. Ferrell? … Does anyone recognize Mr. Blitzer?"

Question No. 4—"Does anyone recognize any of the officers who have been identified by Ms. Melnik? … If any member of the jury panel recognizes any of these officers or recognizes the names of the witnesses given by Ms. Melnik, please place a four on your card.… Based upon that information, does anyone believe that they know Mr. Jones?… If any member of the jury panel recognizes Mr. Brown or Mr. Lay, please … put a four on your card."

Question No. 5—"Is there anyone who is on the jury panel who believes that they could not follow this instruction? Meaning that you would either not believe him, an officer, because he's a police officer or you believe everything he says because he's a police officer?"

Question No. 6—"Have any of you previously served as a juror in a civil or criminal case and had such an experience as a juror which would lead you to believe that you could not be a fair and impartial juror if selected to serve in this case?… The second portion of the question is whether any member of the panel has ever served as a grand juror."

Question No. 7—"Do any of you have any religious or moral beliefs which would interfere with your ability to serve as a fair and impartial juror in this case?"

Question No. 8—"I want you to look around for a moment because I'm going to ask you whether you know or are acquainted with any other member of the jury panel.… And if the answer to that question is yes, please put a number eight on your card."

Question No. 9—"Do any of you have feelings about the criminal justice system and the way it operates that it would keep you from being a fair and impartial juror?"

Question No. 10—"Is there anyone who because of a physical or mental condition feels that they would be unable to give their full time and attention to this case?"

Question No. 11—"Does anyone have any vision, hearing or language problems which might affect their ability to understand the evidence and the proceedings in this case?... Additionally, if there is any member of the jury panel who knows of another juror who has either similar problems or doesn't seem to understand what's going on here, would you please put number 11 on your card as well."

Question No. 12—"Is there anyone, immediate family members and close friends who is either presently or previously employed by a law enforcement agency?"

Question No. 13—"Again, yourself, immediate family, close friends. Is any member of that group either a lawyer or studied in law school?"

Question No. 14—"[H]as any member of that group, again the group being yourself, immediate family, close friends within the past 10 years been either a victim or a witness or charged with a crime similar to the one that's involved in this case? That being the distribution of heroin.... I've limited it to 10 years. But if it happened longer than 10 years ago but still has an effect on you, I still want you to put down the number 14."

Question No. 15—"Have you, members of your immediate family or close personal friends ever been the victim of, the witness to, or accused of any crime?"

Question No. 16—"Has any member of the jury panel been involved in a neighbor-

hood watch group or some other group that is involved with drugs either whether it's for the decriminalization of drugs or for the increase penalty for the use of drugs.... Also if you're involved in any group which is involved with dealing with crime in general, would you please put a number 16 on your card."

Question No. 17—"Do any of you know of any other reason why you couldn't sit fairly and impartially in this case?"

Question No. 18—"Is there any person who is on this jury panel who would not be able to sit if selected as a juror in this case through Monday of next week?"

Question No. 19—"Do any of you have such strong feelings about drugs that you'd be unable to give both sides in this case a fair and impartial decision?"

Question No. 20—"Is there any member of the jury panel who believes that he or she cannot follow the law as I have just stated it ? ... Just as a point of focus, you must— this includes knowing that the defendant is not required to testify at trial or to call any witnesses. He's not required to prove that he is innocent. And he is not guilty just because he has been charged with a crime."

Question No. 21—"Is there any person who would have difficulty in following the court's instruction that you should give separate independent consideration of the guilt or innocence of each of the defendants?"

WAGNER, Chief Judge, dissenting in part:

In my view, the trial court erred in denying appellant Brown's request to be present during *voir dire* of individual jurors, and the error was not harmless beyond a reasonable doubt. While Brown's assertion of his right to be present came after some of the venire panel had been questioned at the bench out of his pres-

ence, nine persons who ultimately sat on the jury had not been questioned by the time that he requested to be present. This delay alone is not sufficient to attribute to a defendant a waiver of his constitutionally protected rights or to deny them.[1] There was still time for Brown to hear and observe the responses of forty members of the venire panel in order to enable him to participate meaningfully in the jury selection process. Requests to be present after *voir dire* has begun have not been rejected automatically as untimely. *See, e.g., Gary v. United States*, 499 A.2d 815, 834–35 (D.C.1985) (en banc), *cert. denied*, 477 U.S. 906, 106 S.Ct. 3279, 91 L.Ed.2d 568 (1986) (noting that request came "[a]fter the jury selection process began"); *United States v. Washington*, 227 U.S.App. D.C. 184, 705 F.2d 489, 496–98 (1983) (noting that request came "after six jurors of the thirteen jurors [answering the question affirmatively] had been interrogated").

We have said that once a defendant asserts his right to be present during this process, as Brown did here, "the trial court must weigh 'the comfort and security of persons who perform a public service' and the efficient administration of justice against 'the principle that the presence of the defendant is essential to the legitimacy of our criminal justice system.'" *Briggs v. United States*, 525 A.2d 583, 589 (D.C. 1987) (citing *Boone v. United States*, 483 A.2d 1135, 1141 (D.C.1984) (en banc)). Significantly, in *Briggs*, we recognized that

in the *usual* case, this balance weighs in favor of the defendant's right to be present to hear responses at the bench. *See id.* (quoting *United States v. Washington*, 227 U.S.App. D.C. 184, 192, 705 F.2d 489, 497 (1983) (per curiam)).[2] Unlike *Briggs*, the record in this case discloses nothing unusual about the defendant which weighed in favor of denying him his right to observe and hear the responses of the remaining prospective jurors. Moreover, the required balancing process did not take place. The only reason given for the denial of the right here was that appellant had not requested it earlier. As far as we know, it was only the inconvenience of recessing the court long enough to set up the hearing in the jury room that guided the court's determination to deny appellant Brown his right to be present for the responses of the remaining potential jurors. Such a modest inconvenience is insufficient to support a complete denial of the accused's constitutionally protected right to be present. For these reasons, I cannot agree that the trial court did not err in its ruling.

Reversal can be avoided only if the error was harmless beyond a reasonable doubt. In determining whether the denial of a criminal defendant's request to be present at bench conferences to hear and observe *voir dire* questioning of prospective jurors was harmless beyond a reasonable doubt, this court has considered various factors,

1. Super. Ct.Crim. R. 43(a), which sets forth a defendant's right to be present at all stages of the trial, including the impaneling of the jury, "'incorporates the protections afforded by the Sixth Amendment Confrontation Clause, the Fifth Amendment Due Process Clause, and the common law right of presence ....'" *Beard v. United States*, 535 A.2d 1373, 1375 (D.C.1988) (quoting *Welch v. United States*, 466 A.2d 829, 838 (D.C.1983)).

2. *Briggs* was one of those unusual cases in which this court determined that the defendant's request to be present was untimely. 525 A.2d at 590. There, prolonged competency proceedings had preceded the trial, and counsel was on notice that special arrangements would have to be made to accommodate Briggs' condition. *Id.* Therefore, this court concluded that there was no error in denying the defendant's untimely request in light "of the interruptive and special precautions that would have been required ...." *Id.*

"including (1) the extent of appellant's exclusion from the jury selection process, (2) the number of prospective jurors questioned by voir dire who ultimately served on the jury panel, and (3) whether the defendant had exhausted all of his peremptory strikes." *Kleinbart v. United States*, 553 A.2d 1236, 1243 (D.C.1989) (Gallagher, J., dissenting) (citing *Gary, supra*, 499 A.2d at 835; *Young v. United States*, 478 A.2d 287, 290–91 (D.C.1984)). Examining the circumstances of this case against these factors, it does not appear that the error was harmless beyond a reasonable doubt.

First, none of the jurors responded to *voir dire* questions in appellant's presence in open court. The procedure utilized in this case required the jurors to note on a card the number of any question to which he or she had a response. Thereafter, they were called to the bench to respond to the questions they had noted. Thus, they never responded to any questions in open court. We have held that where "the entire voir dire was conducted at the bench, outside appellant's presence," the error is not harmless. *Kleinbart, supra*, 553 A.2d at 1240 n. 6.[3] *See also Beard, supra* note 1, 535 A.2d at 1376 (refusing to find harmless error where "virtually all of the voir dire was conducted at the bench," "appellant had practically no opportunity to hear any juror speak in open court," and was prevented from hearing forty-five transcript pages of discussion with the jury); *Robinson, supra* note 3, 448 A.2d at 856 (error not harmless where defendant prevented from hearing forty transcript pages of discussion). In this case, appellant Brown was prevented from hearing responses from some forty jurors after he made his request, in proceedings covering some 100 transcript pages. Under the cited precedents, the length of appellant's exclusion weighs against a finding of harmless error.

The second factor, which considers the number of prospective jurors questioned by *voir dire* who ultimately served on the panel, also weighs against a harmless error finding. In this case, nine of the jurors who actually served were questioned at the bench after appellant's request to be present was denied.[4] The error of excluding the defendant from the *voir dire* has been found not to be harmless where six potential jurors who actually served on the panel were questioned after the denial of a Superior Court Criminal Rule 43 request. *See Beard, supra* note 1, 535 A.2d at 1376.

Whether the defendant had exhausted all of his peremptory strikes is a third factor considered in the harmless error analysis. Specifically, it has been held harmless error where the defendant could have used remaining peremptory challenges to remove a challenged juror, and thereby cure the error. *See Gary, supra*, 499 A.2d at 835; *Young, supra*, 478 A.2d

---

3. The panel in *Kleinbart* noted:
 Moreover, the entire voir dire was conducted at the bench, outside appellant's presence. The case is thus distinguished from those cited in the dissent, in each of which only a portion of voir dire was conducted at the bench, and only two jurors so questioned were impaneled. By contrast, this case presents a more egregious violation than that in *Robinson v. United States*, 448 A.2d 853, 856 (D.C.1982), where only "the bulk of voir dire" was conducted at the bench.
 *Kleinbart, supra*, 553 A.2d at 1240 n. 6 (citing *Gary, supra*, 499 A.2d at 835; *Young, supra*, 478 A.2d at 290–91; and *Washington, supra*, 227 U.S.App. D.C. at 193, 705 F.2d at 498).

4. Two of the nine selected as jurors were alternates, and therefore, excused before deliberations commenced.

at 289–90 & n. 6. Whether appellant had exhausted all of his peremptory strike is not entirely clear from the record.[5] However, with only six strikes available, appellant would not have been able to eliminate all seven of those jurors who responded to questions outside of his presence.

Finally, I am not persuaded that our harmless error determination can be guided by our view of the significance of the jurors' responses to the questions at the bench, *i.e.,* whether aggravated or not. "A juror being examined at the bench may give answers concerning persons, places, or events that would mean nothing to counsel, but would alert defendant to the existence of a ground for challenge for cause." *Boone, supra,* 483 A.2d at 1143 (Belson, J., concurring). It is a defendant's exclusion from the process that frustrates its purpose, which is to enable the accused to help counsel exercise peremptory challenges and challenges for cause. *See id.* at 1138, 1143. For these reasons, I respectfully dissent from the opinion of the court insofar as it finds no reversible error on Brown's challenge to exclusion from the jury selection process. Otherwise, I concur in the court's opinion.

---

**5.** Neither the transcript of the proceedings nor the jury list and report on which the strikes were recorded reveal who exercised the peremptory challenges, *i.e.,* the government, Brown or Lay. Counsel presented their strikes in writing, and the numbers were read out without attribution to any particular party.